NOT DESIGNATED FOR PUBLICATION

Nos. 116,741
116,742

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
N.L. and J.S,
Minor Children.

MEMORANDUM OPINION

Appeal from Ford District Court; VAN Z. HAMPTON, judge. Opinion filed June 23, 2017.
Affirmed.

*J. Scott James*, of Greensburg, for appellant natural father.

*Kathleen Neff*, assistant county attorney, and *Kevin Salzman*, county attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*: Father, R.S., appeals the termination of his parental rights to his children. He argues the district court erred in finding agencies had made reasonable efforts to rehabilitate the family and the district court did not make a finding that termination of parental rights was in the best interests of the children. Finding no error, we affirm.

Father is the natural father of J.S., born in 2004, and N.L., born in 2013. Mother, K.L., is the natural mother of J.S. and N.L. Mother also has another child, J.L., born in 2000. On September 9, 2015, the State filed child in need of care (CINC) petitions for all three children. The State alleged the family had unstable housing and had moved three times in the last year. The younger two children were living with their grandmother who

1

could not keep them and had no food. The oldest child was living with a family friend. Mother had removed the children from school because the family was going to move. However, they had not moved, and she had not reenrolled them. The family had a long history of contacts with the Department for Children and Families (DCF). The district court placed the children into protective custody.

The district court held a temporary order hearing on September 14, 2015. Father was present at the hearing. He submitted a UA test. He admitted that he would test positive for methamphetamines and marijuana. The court placed the children in the temporary custody of DCF, and conditioned Father's visitations with the children on clean UAs.

The district court held an adjudication hearing on October 21, 2015. At the time of the hearing, Mother and Father were staying off and on with Mother's friend. Father was planning to start a job at KFC the next day. He submitted a clean UA on the day of the hearing. The court found that J.S. and N.L. were children in need of care. In its finding, the court noted J.S. had come to school dirty so often that a teacher had taken him to the store to buy soap, shampoo, toothpaste, and underwear with school funds. The court also indicated the parents were drug users who did not have stable housing or employment. Because there was some question as to paternity, the court ordered DNA testing to determine if Father was N.L.'s biological father.

At a review hearing on March 16, 2016, the district court found DNA testing had established Father was the biological father of N.L. Father stipulated to using methamphetamine in the past 48 hours. The court placed J.L. in the custody of her natural father. The court found reintegration was no longer a viable option for J.S. and N.L. and their cases should proceed towards termination. The court ordered the parents to no longer have unauthorized social media contact with the children via Facebook.

2

On April 20, 2016, the district court held a permanency hearing. Father tested positive for methamphetamines and morphine. The court reiterated that the case plan goal was changed to adoption, and the cases should proceed to termination.

On May 31, 2016, the State filed a motion for termination of Mother and Father's parental rights. The State alleged Father was unfit under K.S.A. 2016 Supp. 38-2269 because (1) he was using methamphetamines; (2) he had only completed 2 out of 18 case plan tasks; (3) he had not maintained regular visitation with the children; (4) he was unemployed and homeless and had to rely on others to care for the children; and (5) he had not paid any child support. The State alleged it was in the best interests of the children to terminate Father's parental rights and place the children in a permanent adoptive home or with a permanent custodian.

On August 29, 2016, the district court held a termination hearing. Two witnesses testified at the hearing. Leatha Benson, a social worker with DCF, testified that on August 20, 2015, she received a report that J.S. and J.L. were living with their grandmother in a senior living building. The housing authority did not allow children to live with any of the residents. The grandmother did not have money to buy food and clothing for the children, and the parents were not contributing financially.

Benson testified that J.S. was not attending school at that time. Benson's understanding was the parents had withdrawn the children from school because the family was moving. The family ended up not moving, but the parents did not reenroll J.S. in school.

According to Benson, the grandmother told her that N.L. was with the parents. Benson was unable to get in touch with either Mother or Father. On September 9, 2015, police officers went to the address Benson had for the parents and removed the children

from the parents' custody. Neither parent had a job at that time. Benson left the case in December 2015 when she left DCF.

Benson testified the family had had 14 prior intakes with DCF. The first intake was on August 23, 2004. DCF had offered the family services at each one of those contacts.

Rodney Taylor, a case manager for St. Francis Community Services (St. Francis), testified he became the case manager for J.S. and N.L. in September 2015. The first case plan was held on September 28, 2015. Both parents were present and had input into the case plan tasks. They did not have jobs at that time.

Taylor testified that the parents had not completed any of their case plan tasks. They were allowed weekly visits with the children; however, they first had to pass a drug test. In almost a year, they had had only three visits with their children mostly because they failed to take UAs or submit to mouth swabs, with perhaps two or three actual test failures. They could have possibly visited their children two more times but they failed to show up for the visits.

Taylor testified he contacted the parents every week about taking a UA. He called between 9 a.m. and 10 a.m. on the morning when the parents were to take the UAs. They were supposed to provide phone numbers so Taylor could inform them about the UA. Taylor said phone contact was problematic because the parents' phones would run out of minutes. He had five phone numbers for them but did not know which one was the current one. He called each number and sent texts messages to the phones that could receive texts. After notification, the parents would come to the St. Francis office to get a form and then go to another location to take the UA before 4:30 p.m.

Taylor stated Father said he could not take the UAs because he did not have photo identification, so St. Francis bought Father an ID. Father also said he could not take the UAs because he did not have transportation. Taylor told Father that the bus was an available mode of transportation. Taylor spoke with the bus drivers, and they said they would be willing to wait while Father ran into the St. Francis office to get the form he needed to take the UA. Taylor testified that parents must be able to problem solve and if he was unable to solve this problem for himself, it raised questions about whether he would be able to solve problems for his children. Taylor did not do anything more to help with the transportation issue.

Taylor said that on two occasions they had offered to perform mouth swabs for the parents instead of requiring them to take a UA. One of those times someone even went to the parents' residence to do the mouth swab. Both times the parents refused. St. Francis had never offered to set up a plan of regular mouth swabs.

Taylor testified Father had a case plan task to have gainful employment, but he had only worked at KFC for about 3 weeks. Taylor understood KFC terminated Father's employment because he failed to show up for work. Father also claimed he was applying for disability but never provided any documentation. Both parents had a case plan task of obtaining stable housing. According to Taylor, they frequently moved between the grandmother's senior living home and a friend's home. They did have an apartment, provided through an agency, for 2 or 3 months. Taylor attempted to visit several times, including making appointments and just stopping by, to verify the home was safe for the children, but the parents were never home. Taylor did not help them to find housing other than providing the names and numbers of landlords.

Taylor stated that Father had a mental health evaluation on November 24. The recommendations were for ongoing counseling, but he did not follow through on the

recommendation. Father had a drug and alcohol evaluation but did not follow those recommendations, either. Father never started parenting classes.

According to Taylor, Father was to have no contact with the children that St. Francis had not authorized. However, he had contact with J.S. on Facebook. He addressed J.S. in posts and said he was trying very hard to get him back. J.S. believed him and was very disappointed when he found out Father was not taking drug tests.

Taylor testified that meeting with the parents was difficult. He met them twice at the grandmother's senior living home and twice at his office. Taylor sometimes met with them briefly after court hearings. As part of their case plan, they were to stay in contact with St. Francis, but they failed to do so. They did not advise him of changes in address or phone number within 24 hours. Taylor had not heard from Father since April and did not have a current phone number or address for him.

At the conclusion of the hearing, the district court found "by clear and convincing evidence, that the parents are both unfit to parent these children, and it's in the best interest[s] of the children to terminate parental rights." In the journal entry, the court took judicial notice of the record in each child's case, and found the factors of unfitness as stated in the State's motion for termination applied to Father. However in the journal entry, the court did not include its finding that termination of Father's parental rights was in the best interests of the children. Father appeals.

Father first argues the district court erred in finding that the relevant agencies had made reasonable efforts to rehabilitate the family. The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2016 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2016 Supp. 38-2269(a). "[W]hen an appellate

6

court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008); see *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (applying standard of review). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The Revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a CINC. K.S.A. 2016 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2016 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2016 Supp. 38-2269(c). Any one of the factors in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f). Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2016 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2016 Supp. 38-2269(g)(1).

In this case, the district court found Father unfit due to the following factors:

- K.S.A. 2016 Supp. 38-2269(b)(3)—the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;
- K.S.A. 2016 Supp. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

7

- K.S.A. 2016 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child;

- K.S.A. 2016 Supp. 38-2269(c)(1)—failure to assure care of the child in the parental home when able to do so;

- K.S.A. 2016 Supp. 38-2269(c)(2)—failure to maintain regular visitation, contact, or communication with the child or the custodian of the child;

- K.S.A. 2016 Supp. 38-2269(c)(3)—failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home;

- K.S.A. 2016 Supp. 38-2269(c)(4)—failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay.

Father only challenges the district court's finding as to K.S.A. 2016 Supp. 38-2269(b)(7), failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family. This court has held that K.S.A. 2016 Supp. 38-2269(b)(7) "clearly imposes an obligation on the relevant agencies to expend reasonable efforts towards reintegrating the child with her parents by correcting the conduct and condition that resulted in the removal of the child." *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion); see K.S.A. 2016 Supp. 38-2201(b)(8) (citing as a goal of the Code the provision of "preventative and rehabilitation services, when appropriate, to abused and neglected children and their families so, if possible, the families can remain together without further threat to the children"). The statute does not, however, "require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan." *In re B.T.*, 2015 WL 1125289, at *8.

Father contends that he faced significant obstacles in adjusting his circumstances because of his drug addiction and lack of financial resources. He did not have employment, a reliable means of communication, or a mode of transportation. He was also effectively homeless when the case began and had mental health issues and physical

8

limitations which the agencies were aware of. According to Father, no one provided him any help in overcoming these obstacles.

Father specifically points to his repeated failures to take UAs as required by his case plan. He claims St. Francis did not do enough to help him comply with this requirement. The record shows, however, that St. Francis provided Father with a photo ID so he would be able to take the UAs. Taylor testified that he would call or text five different phone numbers in order to notify Father about his required UA because Taylor was not sure which number was Father's current contact information. Taylor told Father about the available public transportation and verified with the bus drivers that they would wait while Father ran into the St. Francis office to get the form he needed to take a UA. On two occasions, St. Francis offered to conduct mouth swabs instead of requiring the UA, but Father refused both times. On one of those occasions, someone from St. Francis even went to Father's home to conduct the mouth swab. A St. Francis court report from March 4, 2016, also stated "[Mother and Father] are failing to take UAs and mouth swabs, even when [St. Francis] has offer[ed] to take them to UA."

Father contends that St. Francis was aware of his mental health issues and drug addiction but did nothing. Contrary to this assertion, Father's case plan included tasks that he get a mental health and a drug and alcohol evaluation and follow through with any recommendations. Outpatient treatment for drug addiction was available to Father through two different agencies, New Chance and Compass Behavioral Health. Father's drug and alcohol assessment recommended he receive outpatient treatment from New Chance, but Father wanted to receive outpatient treatment from Compass. He never enrolled at New Chance, and he only attended two therapy sessions and one group session at Compass. Father did not attempt to get ongoing counseling for his mental health issues as recommended in his evaluation.

9

Father argues he had a disability, and the relevant agencies should have taken his disability into account. He cites to K.S.A. 2016 Supp. 38-2201(c)(2), which states, "[i]n cases involving a parent with a disability, determinations made under this code shall consider the availability and use of accommodations for the disability, including adaptive equipment and support services." Father does not appear to have raised this argument before the district court. Generally, arguments not raised before the district court cannot be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011).

Additionally, while Taylor acknowledged Father had a disability, there is virtually no other information about his disability in the record. Because the nature and extent of Father's disability is not in the record, it is impossible to determine what sort of accommodations St. Francis could or should have provided. Father's case plans and the St. Francis court reports do not indicate that Father ever brought this issue, including the possible need for accommodations, to the attention of relevant agencies. Father had the burden to provide a record on appeal to support this claim, and he has failed to do so. Accordingly, this claim fails. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013).

While Father would like to claim that his inability to comply with the case plan was due to the failure of agencies to assist him, he failed to follow through with tasks and requests that required little or no resources. For example, Father was having contact with J.S. through Facebook despite a case plan task that he not have any unauthorized contact with the children. He refused to submit to mouth swabs, even when St. Francis came to his home. He was not home for scheduled home visits. He also claimed to be applying for disability, but he never provided any documentation.

Looking over the record, it is possible there is more St. Francis or other agencies could have done to assist Father. For example, Father suggests St. Francis could have set

up an alternate plan of regular mouth swabs rather than requiring Father to go somewhere to submit to a UA. In making a finding of unfitness under K.S.A. 2016 Supp. 38-2269(b)(7), however, "the test is not whether the social service agencies could theoretically have done more to aid [him] in completing the reintegration tasks." *In re S.C.*, No. 107,950, 2012 WL 5392188, at *3 (Kan. App. 2012) (unpublished opinion). The statute only requires that agencies make reasonable efforts, and agencies do not need to exhaust any and all resources to rehabilitate a parent. *In re J.R.*, No. 104,975, 2011 WL 2175953, at *5 (Kan. App. 2011) (unpublished opinion). See also *In re M.H.*, 50 Kan. App. 2d 1162, 1173, 337 P.3d 711 (2014) (finding that while agency perhaps could have done more, Father's failures could not be attributed to agency). Based on the record, St. Francis and other agencies reasonably tried to provide the services Father would need to reintegrate with his children.

Moreover, K.S.A. 2016 Supp. 38-2269(b)(7) is just one of a number of factors a district court may consider in determining if a parent is unfit, and any one of those factors may establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f). Father does not challenge the district court's findings as to the other factors, and substantial competent evidence supports those factors. Father either admitted to using illegal narcotics or failed UAs multiple times over the course of the proceedings. He only visited his children three times over the course of almost an entire year, and he made little to no progress on his case plan tasks. There are a substantial number of factors that support a finding of unfitness.

Father next argues the district court failed to comply with the statutory requirement to find termination was in the best interests of the children. Because the district court hears the evidence directly, it is in the best position to determine the best interests of the child. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). We will not overturn that determination absent an abuse of discretion. 44 Kan. App. 2d at 318. A judicial action constitutes an abuse of discretion if (1) no reasonable person would

11

take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

In support of his argument Father cites to *In re K.R.*, 43 Kan. App. 2d 891, 233 P.3d 746 (2010). In that case, the district court found that the mother "was unable to carry through with some of her obligations for the best interests of the children." 43 Kan. App. 2d at 904. The district court did not specifically find that termination of parental rights was in the best interests of the children, though. The *In re K.R.* court held that the district court's finding failed to comply with K.S.A. 2009 Supp. 38-2269(g)(1). 43 Kan. App. 2d at 903-05. Additionally, the court found the record did not indicate termination of parental rights was in the best interests of the children in that particular case. 43 Kan. App. 2d at 903-05.

Father's case is distinguishable from *In re K.R.* The district court in this case explicitly found that termination of Father's parental rights was in the best interests of the children. Preferably, the district court would have included this finding in its written journal entry. See *In re B.E.Y.*, 40 Kan. App. 2d 842, 844-45, 196 P.3d 439 (2008). This does not lead to the conclusion the district court failed to comply with the statutory requirement though. The record demonstrates that the court did make a finding that termination was in the best interests of the children.

In a single sentence, Father appears to alternatively argue that the district court did not consider the requisite factors under K.S.A. 2016 Supp. 38-2269(g)(1) in making its finding. In considering termination, the district court must give primary consideration to the physical, mental, and emotional health of the children. K.S.A. 2016 Supp. 38-2269(g)(1); *In re K.R.*, 43 Kan. App. 2d at 904. As part of this process, "the court must weigh the benefits of permanency for the children without the presence of their parent

12

against the continued presence of the parent and the attendant issues created for the children's lives." 43 Kan. App. 2d at 904.

The district court did not specifically enumerate the factors or findings it relied on in making its determination that termination of Father's parental rights was in J.S.'s and N.L.'s best interests. This does not mean the court abused its discretion though. While the better practice would have been for the district court's journal entry to reflect the factors considered in determining the children's best interests, this is not necessarily required, particularly if the record supports the court's determination. See, *In re B.E.Y.*, 40 Kan. App. 2d at 844-45.

In this case, the record supports the district court's finding that termination of Father's parental rights was in the best interests of the children. At the time of the termination hearing, Father was unemployed for almost the entirety of this case and had only had stable housing for a few months. Father had repeatedly either admitted to using methamphetamines and other drugs or he tested positive for them throughout the pendency of the case. More tellingly, he had made almost no discernible effort to change his circumstances so he could reintegrate with his children.

As for the children, both were reportedly doing well in their current placements. J.S. was back in school and getting good grades with few absences. He was also receiving therapy. N.L. was still too young for school but was working on developing age-appropriate skills. Based on the evidence, the district court made a reasonable finding that termination of Father's parental rights was in J.S.'s and N.L.'s best interests.

Affirmed.